## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO.** |
| **v.** | **VIOLATIONS:** |
| **ERLEND OLSON,** (Counts 1-11) | **Count 1: 18 U.S.C. § 1349** (Conspiracy to Commit Wire and Mail Fraud) |
| **JOHN J. GALLAGHER,** (Counts 1-7) | **Counts 2-6: 18 U.S.C. §§ 1343, 2** (Wire Fraud and Aiding and Abetting) |
| **STEPHEN BUSCHER,** (Counts 1, 4-6) | **Count 7: 18 U.S.C. §§ 1341, 2** (Mail Fraud and Aiding and Abetting) |
| **JOSEPH FARGNOLI,** (Counts 1, 5-6) | **Counts 8-11: 26 U.S.C. § 7201** (Tax Evasion) |
| **and** | |
| **JAMIL SWATI** (Counts 1, 6), | **FORFEITURE ALLEGATION:** 18 U.S.C. §§ 981(a)(1)(C); 21 U.S.C. § 853(p); 28 U.S.C. § 2461(c) |
| **Defendants.** | |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates and at the approximate times stated below:

### Background

1.     Defendant **ERLEND OLSON** ("**OLSON**") was an engineer and inventor. In 2015, **OLSON** founded Theia Group Incorporated ("Theia") and during the life of the company held various leadership positions including Chief Operating Officer, Chief Scientist, and Chief Executive Officer ("CEO"). **OLSON** held an ownership interest in Theia through an entity called Meridian Vector Corporation ("MVC"). **OLSON** resided in New Mexico.

1

2. Defendant **JOHN J. GALLAGHER** ("**GALLAGHER**") was an attorney who was involved with Theia since at least 2016. **GALLAGHER** was the founding partner of Gallagher Law, P.C. in Philadelphia, Pennsylvania. **GALLAGHER** held various leadership positions at Theia including Executive Vice President. **GALLAGHER** was also a member of Theia's Board of Directors. At various times, **GALLAGHER** was the majority shareholder of MVC. **GALLAGHER** resided in Pennsylvania.

3. Defendant **STEPHEN BUSCHER** ("**BUSCHER**") had a background in finance and worked as a consultant for Theia beginning in November 2019. **BUSCHER** was Chief Financial Officer ("CFO") of Theia from February 2021 through August 2021 and held himself out as the CFO of Theia for a period before that. **BUSCHER** resided in Colorado, Florida, and Washington, D.C.

4. Defendant **JOSEPH FARGNOLI** ("**FARGNOLI**") was an engineer who was involved with Theia since shortly after its founding in 2015. At various times, he represented himself as a co-founder of Theia with **OLSON**. **FARGNOLI** was Chief Technology Officer of Theia and held an ownership interest in the company. **FARGNOLI** resided in New York.

5. Defendant **JAMIL SWATI** ("**SWATI**") had a background in finance and first invested in Theia in March 2018. In 2020, **SWATI** organized Investment Group 1, which invested approximately $25 million in Theia in January 2021. In August 2020, **SWATI** was hired by Theia as the Head of Strategic Investments. **SWATI** resided in New York.

6. Theia was incorporated in the State of Delaware on September 9, 2015. During the relevant period, Theia was headquartered in Philadelphia, Pennsylvania and Washington, D.C.

7. MVC was incorporated in the State of Delaware on December 11, 2015. MVC used as its address the address of **GALLAGHER**'s law firm in Philadelphia, Pennsylvania. At the time

2

of its formation, **OLSON** was the sole shareholder of MVC, but ownership changed multiple times at varying percentages between **OLSON** and **GALLAGHER**. MVC was the majority shareholder of Theia.

### The Business of Theia

8.     Theia was a start-up aerospace company that advertised plans to launch 112 satellites, to be known as the Theia Satellite Network ("TSN"), which would provide continuous remote sensing data covering the entire globe simultaneously. According to Theia, the data obtained from the TSN and the speed with which it could be processed by Theia would transform human ability to detect and respond to events, such as earthquakes, wildfires, crime, and global warming, as well as identify certain natural resources under the earth's surface. Theia asserted that this information would be invaluable to government and commercial clients.

9.     Theia estimated that launching the TSN would cost between ten and fifteen billion dollars. The target launch date for the satellites was sometime from 2022 to 2025. While Theia initially raised money and developed plans for the TSN, it sought to generate revenue and prove its concept prior to the launch of the TSN by equipping aircraft with its remote sensing technology to generate data.

10.     Theia's primary funding strategy was the Master Partner Program ("MPP"). Under the MPP, Theia would secure sovereign nations as funding partners by offering data and data analysis from Theia's planned satellite network in perpetuity in exchange for an upfront payment, usually $2 billion. While the MPP nations waited for the launch of the TSN, they would purportedly receive data and services from Theia's aircraft program. Theia never received any funds from any country under the MPP despite claims to the contrary made to prospective investors.

11.     Instead, Theia was funded exclusively by more than $250 million in loans and investments from institutional and individual investors and lenders. Most, if not all, of these investments were fraudulently obtained by Theia misrepresenting its financial position, contracts with third parties, and technical capabilities.

## Fraudulent Solicitation of Friends and Family Investors

12.     Because securing investment from foreign governments would take significant time and resources, Theia, and particularly **OLSON** and **GALLAGHER**, used their network of personal and business contacts to obtain private investments in Theia. This group of investors was known informally within Theia as the "Friends and Family Investors" ("F&F"). From Theia's inception through mid-2021, Theia raised approximately $75 million from approximately 200 F&F investors. These investments took the form of convertible promissory notes, which guaranteed varying rates of return over various periods and generally included an option to convert the investment into Theia shares at the investor's discretion if certain conditions were met.

13.     These investors received and relied upon background materials and supporting documents about Theia that materially misrepresented Theia's financial position, contracts with third parties, and technical capabilities. **OLSON, GALLAGHER**, and others provided materially false updates to many of the F&F investors after their investments in an attempt to either persuade them to invest more money or dissuade them from redeeming their notes at maturity. These materially false updates convinced many investors to extend their notes until an equity conversion event, which never occurred.

### *Investor 1*

14.     An early F&F investor was Investor 1. Investor 1 was introduced to Theia as an investment opportunity by Associate 1, a longtime associate of **OLSON** in 2016. Investor 1

researched the potential investment and received information about Theia primarily from Associate 1, who in turn received his information directly from **OLSON**. In January 2017, Investor 1 and their spouse invested $100,000 in Theia in exchange for a one-year convertible promissory note. While Investor 1 considered a potential investment in Theia, **OLSON** falsely represented through Associate 1 that Theia had, to that point, raised in excess of $20 million. This claim was critical to Investor 1's decision to invest. In reality, Theia had only raised approximately $1 million.

15.    From February 2017 through April 2020, Investor 1 invested additional money in Theia, totaling $410,000, based on misrepresentations from **OLSON**. Throughout that period, with the encouragement of **OLSON** and Associate 1, Investor 1 also introduced dozens of individuals to Theia, resulting in approximately $7 million in F&F investments. Investor 1's initial $100,000 investment was returned. But Investor 1 has received neither a return of the additional $410,000 investment, nor any of the promised investment returns on the $410,000.

*Investors 2 & 3*

16.    In September 2019, Investors 2 and 3 encountered Investor 1 at a high school soccer game. Investor 1 told Investors 2 and 3 about Theia and said that the company was seeking additional investors. On September 28, 2019, Investor 1 sent Investors 2 and 3 an email with information from an investor question-and-answer document ("Q&A") created by **OLSON**.

17.    The Q&A was littered with misrepresentations. It stated Theia was in immediate need of raising $25 million because it had "been asked to fly aircraft producing specialized analytic results from combined sensor technologies for the US Government." **OLSON** claimed that Theia "presently [had] one aircraft equipped and flying on contract and [wished] to build 2 more

immediately. Each aircraft costs approximately $25M to acquire, equip, and prepare for operations

. . . [Theia] can put up to 5 total in service under the existing contract."

> **THEIA IS LOOKING TO RAISE A MINIMUM OF $25 MILLION IMMEDIATELY And IS ACCEPTING QUALIFIED INVESTORS.**
>
> **USE OF PROCEEDS IS TO ACQUIRE AND EQUIP ADDITIONAL AIRCRAFT.**
>
> The company has been asked to fly aircraft producing specialized analytic results from combined sensor technologies for the US Government. We presently have one aircraft equipped and flying on contract and wish to build 2 more immediately. Each aircraft costs approximately $25M to acquire, equip and prepare for operations. In addition to immediate revenue, the data flow off the aircraft and analytic results is preparing some USG agencies to

> prepare for the flood which will come from the TSN. We can put up to 5 total in service under the existing contract.

In reality, Theia did not have an aircraft "flying on contract" and never had any revenue-producing

contract with the U.S. government.

18.     **OLSON** falsely claimed in the Q&A that six countries had committed to the MPP

and that "2 of those are hard commitments with cash escrowed." Theia did not have six countries

committed and had no MPP investment in escrow at that time or ever.

19.     Investor 1 forwarded additional information created by **OLSON** to Investors 2 and

3 via email. This included quarterly updates that provided investors with the supposed status of,

among other things, the MPP and Theia's interim aircraft project.

20.     For example, in the 2nd Quarter 2019 report, **OLSON** stated, "Theia's first

government contract is expected to begin producing revenue in August, with first payment in

September." In the 3rd Quarter 2019 report, **OLSON** stated, "Theia's first government contract

began producing revenue in August, with payment received in September." Theia had no government contract and received no such revenue.

21.     On October 13, 2019, Investors 2 and 3 invested $600,000 in Theia in exchange for a convertible promissory note. Their decision to invest was based largely on the false claims regarding government contracts, revenue, and MPP commitments.

22.     Investors 2 and 3 continued to receive quarterly updates and other information about the status of Theia from **OLSON** via Investor 1. Through April 2021, Investors 2 and 3 invested an additional $760,000 in Theia. These investments were made in reliance on **OLSON**'s misrepresentations in the quarterly updates and other investor materials regarding government contracts, revenue, and the status of the MPP. To date, Investors 2 and 3 have neither received a return on their investment nor return of their investment capital.

*Investor 4*

23.     In March 2020, Investor 1 contacted Investor 4 about the opportunity to invest in Theia. On March 5, 2020, Investor 1 sent Investor 4 the identical information included in the September 28, 2019 email sent to Investors 2 and 3. Approximately one week later, Investors 1 and 4 met in person to discuss Theia further. Following that meeting, Investor 1 put Investor 4 directly in touch with **OLSON**, as they evaluated a potential investment.

24.     While Investor 4 waited to connect with **OLSON**, Investor 1 put together a list of questions, the answers to which Investor 1 believed would assist Investor 4 in evaluating Theia. Investor 1 sent the questions to Associate 1, who forwarded them to **OLSON**.

25.     On March 21, 2020, **OLSON** answered Investor 1's questions on a recorded audio call. On that call, **OLSON** made numerous false representations, including: (1) that Theia had $6 billion in escrow received from MPP nations, when it had no money in escrow; (2) that Theia had

$153 million in cash, when in fact the company had no more than a few million dollars; and (3) that Theia was producing $3.8 million in net cash flow per month from government contracts, when Theia had no contracts or revenue.

26.     Based on these false representations, Investor 4 invested $1 million in Theia on March 30, 2020, in exchange for a convertible promissory note. To date, Investor 4 has received neither a return on their investment nor return of their investment capital.

27.     The questions and their answers provided by **OLSON** on the March 21, 2020 audio call were reduced to writing into a Q&A and shared with Investors 1 and 4. Furthermore, those written questions and false answers or derivative versions of that Q&A were provided to other investors.

### *Investor 5*

28.     In Spring 2020, Investor 5 was connected with Theia via Associate 1—a friend of Investor 5's father. Associate 1 provided Investor 5 with the Q&A **OLSON** created for Investor 4 on March 21, 2020. Associate 1 also connected **OLSON** directly with Investor 5, and the two spoke over the phone regarding Theia.

29.     From the Q&A, Investor 5 was particularly interested in Theia's purported bank account balance of $153 million.

> **The Current State of THEIA**
>
> Can you speak to current financials…?
>
> 1. **What is your current cash level as an entity?**
>    A: Circa $153M excluding funds in escrow or funds ring-fenced for MPP aircraft programs which cannot be spent on TSN or general THEIA activities. Of that $153M, approximately $94M is set aside for payments for MPP at contractors which will come

30.     Investor 5 asked for supporting documentation to substantiate the balance. On April 17, 2020, **OLSON** sent Associate 1 an email attaching a purported March 2020 Theia bank

statement from Bank 1 with instructions to share it with Investor 5 via video conference but not to email it to Investor 5.

31.     Via video conference, Investor 5 was shown a purported bank statement showing a balance of more than $100 million. However, as of March 31, 2020, Theia's primary operating account ending in -8023 at Bank 1 held a balance of just slightly over $2 million.

32.     Investor 5 was also motivated to invest, in part, due to that falsified bank statement and **OLSON**'s claim of $6 billion held in escrow from sovereign nation MPP partners and additional billions of dollars in claimed commitments. In the March 21, 2020 Q&A, **OLSON** represented that the three greatest threats to Theia receiving the claimed $14 billion necessary to launch the TSN were: "(1) Covid kills nearly everyone on earth . . . (2) The entire Theia executive team are killed somehow [; and] (3) The US defaults on treasuries and loses the $6B we have in escrow (held in treasuries)."

1.  **What are your top 2-3 greatest threats that would prevent the $14 Billion funding to happen?**
    A:
    (1) Covid kills nearly everyone on earth (i.e. some unimaginable crisis, which had it not been for Covid we would not even mention, as this sort of thing is always a theoretical threat to every business, both young and old)
    (2) The entire Theia executive team are killed somehow.
    (3) The US defaults on treasuries and loses the $6B we have in escrow (held in treasuries).

33.     On April 20, 2020, Investor 5 wired $2 million to Theia in exchange for a convertible promissory note. When Investor 5 received the Theia investor materials, had a conversation with **OLSON**, and initiated the wire, Investor 5 was in Washington, D.C. To date, Investor 5 has received neither a return on their investment nor return of their investment capital.

*Investors 6, 7, & 8*

34.     Investor 6 knew **OLSON** personally and invested a total of $850,000 in Theia from January through June 2020. On October 19, 2020, **OLSON** reached out to Investor 6 via email with a new investment opportunity in a Theia entity. **OLSON** attached a document entitled "201018 FREQUENTLY ASKED QUESTIONS AND BACKGROUND FOR NEW RAISE."

35.     In that document, **OLSON** falsely claimed, among other things, (1) "Theia had signed definitive documents with MPP counterparties for $18.5B, with each government's $2B due up-front within 180 days;" (2) "6B of the funds [had] been set aside/escrowed;" and (3) excluding the purported MPP money, "THEIA [had] raised over $600M," including money from "2 significant wall-street investment firms[.]" In reality, Theia did not have signed definitive documents with MPP sovereign government counterparties for $18.5 billion, it did not have any MPP money set aside in escrow, and it had raised less than half the purported amount.

36.     Shortly after receiving this email, Investor 6 invested another $200,000 in Theia in exchange for a convertible promissory note. Additionally, **OLSON** offered Investor 6 a financial incentive to recruit other investors using these materials, namely, 10% of the amount raised.

37.     On October 29, 2020, Investor 7 learned about the investment opportunity in Theia from another prospective investor whom Investor 6 sought to recruit and received the document **OLSON** attached to the October 19, 2020 email to Investor 6. Investor 7 was interested in possibly investing and was put in touch with **OLSON** directly.

38.     On November 27, 2020, **OLSON** and Investor 7 started an email chain directly with each other, where **OLSON** answered Investor 7's questions about Theia. On that date, Investor 7 asked **OLSON** for a Theia balance sheet that reflected the claimed $6 billion in

escrowed MPP funds. That same date, **OLSON** sent a false balance sheet claiming total assets in excess of $25 billion and making reference to the $6 billion of MPP funds that were in escrow.

39.     On December 1, 2020, Investor 7 asked **OLSON** whether there were third-party verifications of the $6 billion in escrow. That same day, **OLSON** sent Investor 7 an email from Washington, D.C., where he stated, "Yes we have third party verification of the amounts in escrow. We are happy to show it to you, but you would have to come to our offices to see it."

40.     On December 1, 2020, Investor 6 was in Virginia visiting their parent—Investor 8. Investor 6 offered to visit Theia's Washington, D.C. office while they were in the area and view the escrow statement on behalf of themself, Investor 7, and two other potential investors who were not in the area. Investor 7 agreed.

41.     On December 6, 2020, Investor 6 visited Theia's Washington, D.C. headquarters with Investor 8. In the presence of **OLSON** and **FARGNOLI**, Investor 6 was shown a fake escrow statement with a balance in excess of $6 billion.

42.     On December 6, 2020, Investor 6 sent Investor 7 an email, stating, "I reviewed Theia's confirmation of the escrow account that had a balance of $6 billion (and change from accrued interest) today at their office. I'm happy to answer any additional question you might have."

43.     On December 11, 2020, Investor 7 received a convertible promissory note in exchange for $50,000 countersigned by **OLSON** on behalf of Theia. On December 11, 2020, Investor 8 wired $1 million in exchange for a convertible promissory note. Investors 6, 7, and 8 have received neither a return on their investment nor return of their investment capital.

### The Fake Escrow Letter

44.    In early January 2020, **GALLAGHER** approached Attorney 1—his relative—about a Theia business opportunity. Specifically, **GALLAGHER** and **OLSON** wanted Attorney 1 to sign a letter confirming that Theia had $6 billion in MPP funds set aside in an escrow account, despite Theia having no MPP funds in escrow. On January 6, 2020, **GALLAGHER** forwarded an email from **OLSON** to Attorney 1, with an attached draft escrow letter dated December 31, 2019. On January 9, 2020, Attorney 1 traveled to Theia's Washington, D.C. headquarters and met with **GALLAGHER** and **OLSON**, among others, to discuss the opportunity for Attorney 1 to act as an escrow agent for MPP funds that Theia purportedly had in escrow.

45.    **GALLAGHER** arranged for Attorney 1 to return to Theia headquarters on January 14, 2020. There, Attorney 1 met with **GALLAGHER** and **OLSON** to discuss further the escrow agent opportunity. That same day, Attorney 1 and **GALLAGHER** signed a retention agreement drafted by Attorney 1 that described the scope of Attorney 1's work as "general corporate matters and Delaware-related matters." However, **GALLAGHER's** signature appeared on another, forged retention agreement that described the scope of Attorney 1's work as follows: "Client [Theia] is seeking the Firm to act as an escrow agent on Behalf of Theia Group Inc., and to the extent necessary under the contracts between the Client and other MPPs, for each of the countries of the Master Partner Program ("MPP")." Attorney 1's signature appeared on that retention agreement, but they did not sign it or authorize it to be signed on their behalf.

46.    During the January 14, 2020 meeting at Theia's headquarters, Attorney 1 was also shown a fake December 2019 escrow statement purporting to show a balance of more than $6 billion. The fake escrow statement purported to be from Bank 1 and contained the account number for Theia's true account at Bank 1 ending in -8023. Specifically, the fake escrow statement

reflected an account balance of $6,000,859,314.63. In truth, that account had a December 2019 balance of $859,314.63—exactly $6 billion less than the amount shown on the fake escrow statement. The fake escrow statement was identical to the December 2019 statement on Theia's true account except for the balance and the substitution of the word "escrow" in two locations as indicated below. **GALLAGHER** was a signatory on the true account and oversaw the alleged MPP.



Theia's True Account Statement                    The Fake Escrow Statement

47.     Following the viewing of the fake escrow statement, Attorney 1 agreed to sign a letter confirming that Theia had $6 billion in escrow from three MPP participants. Around that time, **OLSON** and **GALLAGHER** used the letter to try to obtain the participation in the MPP of an additional party. However, as described below, the letter was also repurposed to show potential investors.

**Fraudulent Solicitation of Investment of Investment Group 1**

48.     In May 2020, **SWATI**, an individual investor in Theia, and Associate 2 were considering forming an investment vehicle to make a high-dollar investment in Theia via an aggregation of numerous potential investors—Investment Group 1. **SWATI** and Associate 2

engaged Law Firm 1 to assist in due diligence of Theia and corporate matters related to Investment Group 1.

49.     Throughout May and early June 2020, **SWATI** and Associate 2 began asking **OLSON** preliminary due diligence questions about Theia. A meeting was scheduled at Theia's headquarters in Washington, D.C. for June 17, 2020, with **SWATI**, Associate 2, and Attorney 2 from Law Firm 1.

### *The June 17, 2020 Meeting*

50.     In anticipation of the June 17, 2020 meeting, **GALLAGHER** texted Attorney 1 stating, "[N]eed an update verification for Erlend [**OLSON**] for Wednesday morning [June 17, 2020] in DC. Please call." On June 15, 2020, **OLSON** sent Attorney 1 a fake May 2020 escrow statement showing the same balance of more than $6 billion as the fake December 2019 escrow statement. At that time, Theia's actual account at Bank 1 had a balance of approximately $5 million. After seeing the May 2020 fake statement, Attorney 1 agreed to sign an updated letter. On June 16, 2020, Attorney 1 mailed the signed updated escrow letter from New Jersey to **GALLAGHER** at Theia's headquarters in Washington, D.C.

51.     At the June 17, 2020 meeting, **SWATI**, Associate 2, and Attorney 2 were shown a false and fraudulent statement showing $6 billion in escrow for Theia and the accompanying third-party confirmation letter signed by Attorney 1 dated June 1, 2020. Other than the date, that letter was virtually identical to the January 2020 letter created by **GALLAGHER** and **OLSON** for the purpose of showing the potential MPP participant, which was signed by Attorney 1.

52.     The escrow letter stated the following:

June 1, 2020

To:    Theia Group Inc.
       John J. Gallagher, Esquire
       Member of the Board of Directors
       Audit Committee
       1455 Pennsylvania Ave NW Suite 800
       Washington DC 20004

Dear Director Gallagher:

For purposes of your audit and accounting, I hereby confirm on June 01, 2020 the following:

- My firm has been asked to serve as the escrow agent on behalf of Theia Group Inc., a Delaware C Corporation, and for each of the countries of the Master Partner Program ("MPP").

- The present amount of funds and/or funds equivalent in face value of US T-bills earmarked for escrow is $6,000,000,000.00.

- The aforementioned amount is composed of the MPP participation fees of 3 non-US governments. The names of the governments are confidential under the escrow, and disclosure requires the permission of said governments.

### *The December 4, 2020 Investor Presentation*

53.     Encouraged by the June 17, 2020 meeting, Associate 2 reached out to the CEO of Wealth Management Company 1 for assistance in recruiting investors to Investment Group 1. In Associate 2's overture to Wealth Management Company 1, they mentioned that Theia had secured financing for the totality of the TSN through the MPP and already had a significant amount of the required capital in escrow.

54.     From August 2020 through December 2020, Wealth Management Company 1 began its own due diligence on Theia and made several visits to Theia's Washington, D.C.

headquarters. Throughout this process, Wealth Management Company 1 also began to reach out to their network of clients about investing in Theia through Investment Group 1. This process culminated in a December 4, 2020 virtual investor presentation by **OLSON, BUSCHER, FARGNOLI**, and **SWATI** to representatives of Wealth Management Company 1 and to potential investors in Investment Group 1. By this time, **SWATI** was both an organizer of Investment Group 1 and Theia's Head of Strategic Investment. **OLSON** and **FARGNOLI** were in Washington, D.C. at the time of this presentation, while many of the attendees were spread out around the country and the world.

55.    On the call, which was recorded, **OLSON** repeated the misrepresentation that Theia had received $6 billion from MPP nations and had it set aside. **OLSON** also presented a slide stating that Theia was already producing income from U.S. government contracts and commercial clients, neither of which was true.

56.    Also, during the presentation, **FARGNOLI** discussed what Theia termed its "proven analytics" and presented the slide shown below. Specifically, **FARGNOLI** described business sectors where Theia's remote sensing technology had purportedly been successful using aircraft. In describing these sectors, **FARGNOLI** made multiple references to Theia's "customers," although they did not have any.



| PROVEN ANALYTICS (2) | | | 𝗧 THEIΔ |
| --- | --- | --- | --- |

**THEIA DECISION-GRADE® ANALYTICS AND M3® TECHNOLOGY IS EXTENSIVELY PROVEN FROM AIRCRAFT**

| | FUNCTION | KEY PROOF METRIC | EXTENT OF ACTIVITY/PROOF |
| --- | --- | --- | --- |
| **PRECISION DIGITAL POLICING** | CONTINUOUSLY CAPTURES ENTIRE EARTH WITH 0.2 TO 0.5 METER RESOLUTION, WITNESSING THE BEFORE AND AFTER OF EVERY CRIME OR ILLEGAL PHYSICAL EVENT ON GROUND | 94% SUCCESS | DIGITAL POLICING USING WIDE AREA MOTION IMAGERY TECHNOLOGY OVER 19 MAJOR CITIES IN 3 COUNTRIES, DIRECTLY TRACKING THE PERPETRATORS OF PHYSICAL CRIMES 94% OF THE TIME, SINCE 2009 |
| **INFRASTRUCTURE ASSURANCE** | IDENTIFICATION AND GRADING OF ANOMALIES OR WEAKNESS IN PIPELINES, ROADS, BRIDGES, RAILWAY, AND VARIOUS TYPES OF FACTORIES | 97% CORRECT | OVER 2900 BUILDINGS AND INFRASTRUCTURE ELEMENTS TRACKED AND GRADED OVER A PERIOD OF 5 YEARS, WITH SELECTED COMPARISONS TO GROUND-TRUTH EXAM |
| **NATURAL CATASTROPHE MAPPING & PHYSICAL INSURANCE** | MAPPING OF DAMAGE TO BUILDINGS, INFRASTRUCTURE, INCLUDING UTILITIES IN ORDER TO PRIORITIZE REPAIRS AND INSURANCE SETTLEMENTS | 94% CORRECT | 14 MAJOR NATURAL DISASTERS COVERED, APPROXIMATELY 7,000 CLAIMS PAID BASED ON THEIA RESULTS OF REMOTE SENSING BASED EVALUATION OF DAMAGE |
| **PRECISION SURVEYING FROM OVERHEAD** | PROVIDES 10 CM ACCURATE SURVEY OF PROPERTY CORNERS AND BOUNDARIES FROM OVERHEAD, USING DUAL BAND INSAR RADAR TECHNIQUE, COVERING 1000'S OF PROPERTIES PER DAY | 99.73% CORRECT | THEIA HAS USED ITS PATENT-PENDING TECHNIQUE TO LOCATE 792 PROPERTY CORNERS TO 10 CM ACCURACY FROM AIRCRAFT, WITH RANDOM SAMPLE CHECKED BY GROUND SURVEY |
| **ILLEGAL FISHING & SMUGGLING ACTIVITY AT SEA** | DETECTS AND ALERTS BASED ON 20 METRICS ASSOCIATED WITH BEHAVIOR OF SHIPS AND VESSELS IN EEZ | 86% CORRECT | 86% OF IDENTIFIED CASES THAT WERE CHECKED BY COAST GUARD OR OTHER AUTHORITIES RESULTED IN DETERMINATION OF ILLEGAL GOODS OR FISHING |
| **BURIED OBJECT DETECTION** | MAPS PROBABILITY OF BURIED OBJECTS TO APPROXIMATELY 20 METERS | 94% SUCCESS | 94 out of 100 FINDS IN MULTIPLE TRIALS IN FOREIGN COUNTRIES FOR BURIED IEDS, UXO, WEAPONS GEO-CACHE |

**THEIA'S TEAM HAS OVER 29,000 HOURS OF REMOTE SENSING FLIGHT TIME OVER PAST 19 YEARS**
**TSN SENSORS CAPTURE THE SAME DATA TYPES, QUALITY & RESOLUTION AS THEIA'S AIRCRAFT**

© 2020 THEIA - BUSINESS CONFIDENTIAL AND PROPRIETARY - DO NOT COPY OR DISTRIBUTE

23

57.    **FARGNOLI** also discussed the ability of Theia's technology to track perpetrators of crimes and "closing cases." **FARGNOLI** falsely described this as something "we're proving from aircraft and we're now moving to space."

58.    With regard to the insurance sector, **FARGNOLI** described the ability of Theia's technology to assist insurance companies in evaluating claims. **FARGNOLI** stated, "We are doing this on a daily basis literally right now with insurance companies validating this." **FARGNOLI** went on to falsely describe 7,000 claims paid based on Theia's data in 14 major natural disasters.

59.    Wealth Management Company 1 and their clients in attendance were impressed by the presentation, which helped generate great interest in subscribing to an investment in Theia through Investment Group 1.

### The Procurement of Certified Financial Statements

60.    Beginning in September 2020, and as a pre-condition of Investment Group 1's investment, Wealth Management Company 1 asked for audited or certified financial statements

for Theia. On December 8, 2020, Accounting Firm 1 issued an audit opinion for Theia's 2019 financial statements. The audited financials showed that 2019 resulted in a net loss of more than $94 million for Theia and that Theia had no revenue. It also made no mention of Theia holding $6 billion in escrow or Theia having definitive MPP agreements. The accompanying notes further described management's doubt that Theia would remain in business for the next twelve months: "We have therefore concluded there is substantial doubt about our ability to continue as a going concern through December 8, 2021."

61.    On December 9, 2020, **OLSON** and **GALLAGHER** received Accounting Firm 1's audited financials via email. On December 15, 2020, **OLSON** forwarded the financials to **SWATI** and **BUSCHER**, calling them an "absolute disaster." **OLSON** claimed that he would attempt to get them "corrected" by Accounting Firm 1 but that he could not do so in advance of the closing of Investment Group 1's investment. **SWATI** responded, "Hmmm…yeah. This may not be helpful."

62.    **OLSON** and **BUSCHER** went in search of an accountant to certify a false balance sheet that fraudulently included $6 billion in deposits. On December 16, 2020, **BUSCHER** and **OLSON** had an exchange via an encrypted messaging application. **BUSCHER** told **OLSON** that he was "hitting up every former [Accounting Firm 2] Russian we know. One of them will do it for the $$$[.]" **OLSON** then joked, "Maybe we put an advert in eBay. $100k out to fetch us a CPA…." Interpreting this as a serious suggestion, **BUSCHER** responded, "[L]et me think about it. Man if it's ever exposed that we went trolling on eBay for the letter in exchange for cash it just isn't as elegant as your new CFO went searching among his existing [Accounting Firm 2] contacts." **OLSON** responded, "OMG I was totally joking dude…."

63.     On December 16, 2020, **BUSCHER** reached out to Accountant 1—a Cyprus-based accountant—by text message, stating "I'm CFO of a large American company in Washington, DC that needs to find a reliable accounting specialist. How are you doing? Is there a chance you would take a consulting contract, either full time or part time?"

64.     That same day, **BUSCHER** emailed Accountant 1 an income statement showing $13,410,000 in actual 2019 income and $21,741,386 in 2020 income, both of which were false as Theia had no income in 2019 or 2020. **BUSCHER** also included a balance sheet, which falsely and fraudulently contained the $6 billion in escrow deposits. **BUSCHER** stated in the email that he was "interested to have your quick view as to whether or not we are applying IFRS [International Financial Reporting] standards correctly and can offer to pay you $25,000 to help us review it so that I could show it to my board of directors. . . . We are NOT looking for any sort of confirmatory audit work at this point, just an understanding if we are applying proper IFRS standards overall."

65.     In exchange for $25,000, Accountant 1 agreed to assist. On December 18, 2020, Accountant 1 had a call with **OLSON** and **BUSCHER**, who were in Washington, D.C., to discuss the matter further. On December 18, 2020, Accountant 1 sent **BUSCHER** a signed letter certifying the fraudulent financial statements **BUSCHER** had provided and which were attached.

66.     **BUSCHER** forwarded the letter to **OLSON**, who responded, "OMG YOU'VE GOT IT!!! This will be so useful as well for other matters my friend…. [EXPLETIVE] YEAH!!!"

67.     Without consulting Accountant 1 and with the knowledge of **SWATI** and **BUSCHER**, **OLSON** made changes to the balance sheet attached to the letter. Most notably, **OLSON** moved debt Theia owed from a current liability—meaning it was due within a year—to a long-term liability.

68.    Despite organizing Investment Group 1 and knowing the investors' interests in receiving audited financials, **SWATI** never provided Accounting Firm 1's audited financials or opinion to Investment Group 1. Instead, on December 21, 2020, **SWATI** emailed Associate 2 and the CEO of Wealth Management Company 1 Accountant 1's letter and balance sheet and stated, "[P]lease find attached the Theia management accounts as certified by an IFRS accountant and as provided to me by Erlend [**OLSON**] and Steve [**BUSCHER**]."

69.    Based on the escrow letter, the representations by **OLSON** and **FARGNOLI**, and the certification of the false financials obtained by **BUSCHER** and transmitted by **SWATI**, Theia received $24,593,100 from Investment Group 1 in exchange for a convertible promissory note on January 13, 2021. Those funds went into a Theia account, described in more detail in paragraphs 82 and 83, that previously had a balance of $211,107.85. Following receipt of the Investment Group 1's investment, **BUSCHER** initiated the following wire transfers from that account:

| DATE | AMOUNT | RECIPIENT |
|---|---|---|
| January 14, 2021 | $614,827.15 | **OLSON**'s personal account |
| January 14, 2021 | $614,827.15 | **SWATI**'s personal account |
| January 14, 2021 | $122,965.50 | **BUSCHER**'s personal account |
| January 22, 2021 | $150,000 | Entity controlled by **GALLAGHER** |
| February 1, 2021 | $100,000 | **OLSON**'s personal account |
| February 1, 2021 | $97,788 | Entity Controlled by **FARGNOLI** |
| February 11, 2021 | $850,000 | Entity controlled by **GALLAGHER** |

**Fraudulent Solicitation of Investment from Institutional Investor 1**

70.    On October 4, 2018, Institutional Investor 1 loaned $20 million to Theia. On August 7, 2019, Institutional Investor 1 made an additional loan to Theia for slightly less than $5 million.

Shortly thereafter, Theia began seeking a much larger loan from Institutional Investor 1 in excess of $100 million.

71.    On January 9, 2020, the president of Institutional Investor 1 visited Theia's headquarters in Washington, D.C. for a meeting with **GALLAGHER** and others. **GALLAGHER** was the primary contact for Institutional Investor 1. Theia representatives told the president of Institutional Investor 1 that Theia's aircraft was completed and would be ready for deployment in the coming months on a contract with the U.S. government purportedly paying $22,000 and $55,000 per flight hour. Additionally, **GALLAGHER** provided the president of Institutional Investor 1 with an update on the MPP. **GALLAGHER** informed the president of Institutional Investor 1 that Theia anticipated receiving some MPP money in the near future but made no mention of any escrowed funds. Of note, this meeting was the same date as the first meeting at Theia's headquarters with Attorney 1 about obtaining the fake escrow letter confirming Theia had $6 billion in escrow.

72.    On March 26, 2020, **GALLAGHER** sent Institutional Investor 1 via Associate 3 a document titled "Common Q&A." The document was another version of the Q&A created for Investor 4. Notably, the Common Q&A sent to Institutional Investor 1 removed all references to Theia reportedly having $6 billion in escrow and $3.8 million in net cash flow per month from government contracts. Instead, the Common Q&A claimed revenue was forthcoming from a then-existing government contract. The Common Q&A also attached what was titled "Redacted and Shortened Contract with [Country 1]," which was a purported MPP contract.

73.    In actuality, in February 2020, Theia signed an MPP memorandum of agreement with a trust based in Country 1 (the "Trust") but with no affiliation to the government of Country 1. The Trust claimed it would pay Theia a total of $2 billion for use of data from the TSN and

Theia aircraft. In obtaining the agreement with the Trust, **OLSON** and **GALLAGHER** claimed that Theia had $6 billion already in escrow from other MPP counterparties, which was made a warranty of the agreement. Additionally, the Trust agreed to pay an initial $200 million after receiving certification of the $6 billion in escrow. The version of the agreement with the Trust sent to Institutional Investor 1 redacted the name of the counterparty and all references to the $6 billion Theia claimed to the Trust to have in escrow from other MPP counterparties. However, Theia did not redact the portion of the agreement related to the $200 million initial payment.

74.     In April 2020, Institutional Investor 1 received a document from Theia entitled "The Sky is Not the Limit" with additional references to government contracts and to the fabricated MPP agreement with Country 1. Specifically, it falsely stated, "THEIA has been asked to deploy aircraft in support of US programs, through an existing funded open rec program which falls under a native American-owned company." Additionally, the document claimed that there was a trust set up by the government of Country 1, which had entered into a definitive contract with Theia. The document went on to say that the initial payment of $200 million from the trust set up by the government of Country 1 to Theia would be made before August 1, 2020, and that these funds would be unconstrained.

75.     Institutional Investor 1 sought additional due diligence on Theia's contract that purportedly would be producing revenue in the near term. In April 2020, **OLSON** sought to obtain a letter that would satisfy Institutional Investor 1's questions. Theia had recently engaged Consultant 1 to assist the company in identifying government relationships and opportunities. **OLSON** drafted a letter with **GALLAGHER**'s approval addressed to **GALLAGHER** as a member of Theia's board and supposedly from an official at Government Contractor 1 ("GC1

Letter"). The GC1 Letter falsely outlined a subcontracting relationship between Theia and Government Contractor 1. The letter went through many revisions.

76.     On April 30, 2020, **OLSON** emailed the latest draft of the GC1 Letter to Consultant 1 and asked for assistance in getting the letter signed by Government Contractor 1. On May 6, 2020, Consultant 1 sent a revised draft of the letter to **OLSON, GALLAGHER,** and others. **OLSON** responded with another new draft, stating he wanted the letter to sound less like a "'sales call' letter and more like an 'we're doing this' letter." The GC1 Letter included specific references to a subcontracting relationship between Theia and Government Contractor 1. It further described a purported specific U.S. government contract involving a required aircraft model and stated Theia would be paid up to $54,000 per hour. The letter also described the minimum work of Theia under the contract as 960 hours with a proposed average of 1440 hours per year. In reality, there was no subcontracting relationship between Theia and Government Contractor 1 and no specific contracting opportunity had been identified. Instead, the numbers were taken directly from **OLSON**'s initial draft.

77.     On May 7, 2020, **GALLAGHER** sent that false and fraudulent version of the draft GC1 Letter in an email to Institutional Investor 1 through Associate 3.

78.     On May 14, 2020, the GC1 Letter was signed by the CEO of Government Contractor 1 and sent to **OLSON, GALLAGHER,** and others. This signed version of the GC1 Letter was also false and fraudulent.

79.     On May 27, 2020, Associate 3 sent the GC1 Letter to Institutional Investor 1 via email. On June 29, 2020, Institutional Investor 1 agreed to lend approximately $200 million in exchange for two $100 million promissory notes with Theia. Thereafter, a portion of the new loan was used to satisfy the prior loans by Institutional Investor 1; the new notes were secured, in part,

by Theia's purported U.S. Government receivables. In funding the June 2020 loan, Institutional Investor 1 specifically relied on the contract described in the false and fraudulent letter from Government Contractor 1 (that is, one version of the GC1 Letter), as well as the agreement entitling Theia to $200 million from the Trust as primary sources of repayment and significant mitigators of its risk. Institutional Investor 1 was unaware that Theia had secured the agreement of the Trust from Country 1 with false claims of $6 billion in escrow.

80.     Within one week of the deposit of the money from Institutional Investor 1, **OLSON** received $1.8 million from Theia via MVC, and **GALLAGHER** received $4.815 million from Theia through entities and accounts he controlled.

81.     Based on Theia's representations, Institutional Investor 1's loan contained certain conditions. For one, a significant portion of the funding was to be used to purchase and equip the aircraft necessary for the contracts described in the letter from Government Contractor 1. Additionally, Institutional Investor 1 instituted stringent controls over Theia's spending, required visibility into Theia's bank accounts, and created requirements related to any new indebtedness by Theia.

82.     In order to circumvent Institutional Investor 1's visibility into and controls over Theia's finances, **BUSCHER** and **OLSON** agreed to open a new account at Bank 2 without Institutional Investor 1's knowledge. On December 3, 2020, **BUSCHER** and **OLSON** filled out the necessary paperwork to open a new account in Theia's name at Bank 2 (the "New Account"). On the signature card form, **BUSCHER** listed **BUSCHER** and **OLSON** as the only authorized signatories on the New Account. On a form entitled "Certification Regarding Beneficial Owners of Legal Entity Customers," **BUSCHER** listed **OLSON** as the 67% owner of Theia. On December

3, 2020, **BUSCHER** emailed these forms from Washington, D.C. to a representative of Bank 2. Shortly thereafter, the New Account was open.

83.    From December 2020 to June 2021, **OLSON** and **BUSCHER** caused additional funding, including the money from Investors 7 and 8 and Investment Group 1, to be deposited into the New Account. Out of the initial $1.1 million in investor funds deposited into the account between December 9 and December 11, 2020, **OLSON** and **BUSCHER** caused $202,937.96 to be wired to **BUSCHER**, $100,000 to be wired to **OLSON**, and $124,740 to be wired to **FARGNOLI**, in violation of the budgets approved by Institutional Investor 1 in their negotiations with Theia.

84.    On June 29, 2021, the balance on Theia's notes with Institutional Investor 1 came due, and Theia failed to pay. On July 22, 2021, Institutional Investor 1 provided Theia with formal notice that it was in default. Institutional Investor 1 sued Theia, and on October 29, 2021, Theia was ordered into receivership. The vast majority of F&F Investors were unpaid at that time and remain unpaid. From the date of the default until Theia was ordered into receivership, **OLSON** and others continued to solicit investment in Theia using misrepresentations and failing to disclose that Theia was in default with Institutional Investor 1.

<u>**COUNT ONE**</u>
**(Conspiracy to Commit Wire Fraud and Mail Fraud)**

85.    Paragraphs 1 through 84 are incorporated here by reference.

86.    From at least February 3, 2017, and continuing until at least October 29, 2021, in the District of Columbia and elsewhere, the defendants,

**ERLEND OLSON,**
**JOHN J. GALLAGHER,**
**STEPHEN BUSCHER,**
**JOSEPH FARGNOLI, and**
**JAMIL SWATI,**

25

and others known and unknown to the Grand Jury, did knowingly and intentionally combine,

conspire, confederate, and agree with each other and with others to commit the offenses of wire

fraud and mail fraud, that is, to knowingly, and with the intent to defraud, devise a scheme and

artifice to defraud, and to obtain money and property by means of materially false and fraudulent

pretenses, representations, promises, and, for the purpose of executing the scheme and artifice, (a)

to knowingly and intentionally transmit and cause to be transmitted writings, signs, signals,

pictures, and sounds, by means of wire communications in interstate commerce, in violation of

Title 18, United States Code, Section 1343, and (b) to knowingly take and receive from an

authorized depository for mail any matter or thing, knowingly cause to be delivered by private and

commercial interstate carrier any matter or thing, and deposit and cause to be deposited any matter

or thing whatever to be sent and delivered by any private and commercial interstate carrier, in

violation of Title 18, United States Code, Section 1341.

## OBJECT OF THE CONSPIRACY

87.     It was the object of the conspiracy for **OLSON, GALLAGHER, BUSCHER,**

**FARGNOLI, SWATI,** and others known and unknown to the Grand Jury, to obtain money and

to personally enrich themselves by making false and fraudulent material misrepresentations to

investors to induce and encourage them to make and maintain investments in Theia.

## MANNER AND MEANS OF THE CONSPIRACY AND SCHEME TO DEFRAUD

88.     The manner by which **OLSON, GALLAGHER, BUSCHER, FARGNOLI,**

**SWATI,** and others known and unknown to the Grand Jury, sought to accomplish the objects of

the conspiracy included, among other things, the following:

   a) Misrepresenting Theia's financial position, including Theia's cash-on-
      hand, income, and money set aside in escrow;

26

b) Misrepresenting that Theia had revenue-producing contracts with the United States and foreign governments;

c) Misrepresenting that Theia had commercial clients and what Theia's technology had accomplished on behalf of those clients;

d) Falsifying bank statements, balance sheets, and other financial documents to be shown to potential investors;

e) Concealing true bank statements, balance sheets, and other financial documents, such as audit opinions and audited financial statements;

f) Misrepresenting progress in the MPP, including what sovereign nations had signed on to the program and what financial commitments they had made; and

g) Misrepresenting to investors the status of Theia's aircraft program, including the number of flights taken, the amount of data collected, and how that data had been used and analyzed.

**(Conspiracy to Commit Wire and Mail Fraud, in violation of
Title 18, United States Code, Section 1349)**

## COUNTS TWO THROUGH SIX
### (Wire Fraud)

89. Paragraphs 1 through 84 and 88 are realleged.

90. From at least February 3, 2017, and continuing until at least October 29, 2021, in the District of Columbia and elsewhere, the defendants,

**ERLEND OLSON,
JOHN J. GALLAGHER,
STEPHEN BUSCHER,
JOSEPH FARGNOLI**, and
**JAMIL SWATI,**

and others known and unknown to the Grand Jury, did knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money by means of material false and fraudulent pretenses, representations, and promises; specifically, the defendants sought to obtain money and to personally enrich themselves by making false and fraudulent material misrepresentations to investors to induce and encourage them to make and maintain investments in Theia.

91.    On or about the dates set forth below, in the District of Columbia and elsewhere, the listed defendants, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowingly and intentionally transmitted and caused to be transmitted writings, signs, signals, pictures, and sounds, by means of the following wire communications in interstate commerce:

| Count | Defendant(s) | Approximate Date | Description |
|---|---|---|---|
| 2 | **OLSON GALLAGHER** | April 20, 2020 | $2 million interstate wire transfer from Investor 5 in Washington, D.C. to Theia's bank account with Bank 1. |
| 3 | **OLSON GALLAGHER** | December 1, 2020 | Email from **OLSON** in Washington, D.C. to Investor 7, outside of Washington, D.C., encouraging Investor 7 to come to Theia's office to verify the $6 billion Theia purportedly had in escrow. |
| 4 | **OLSON GALLAGHER BUSCHER** | December 3, 2020 | Email from **BUSCHER** to a representative of Bank 2 with the required forms to open the New Account. |
| 5 | **OLSON GALLAGHER BUSCHER FARGNOLI** | December 4, 2020 | Virtual investor presentation for Wealth Management Company 1 and investors in Investment Group 1. |
| 6 | **OLSON GALLAGHER BUSCHER FARGNOLI SWATI** | December 18, 2020 | Call from **OLSON** and **BUSCHER** in Washington, D.C. to Accountant 1 in Cyprus to obtain certification of false financial statements for Investment Group 1. |

**(Wire Fraud, Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Sections 1343 and 2)**

<u>**COUNT SEVEN**</u>
**(Mail Fraud)**

92.    Paragraphs 1 through 84, and 88 are incorporated here by reference.

93.    On or about the dates set forth below, in the District of Columbia and elsewhere,

defendants

**ERLEND OLSON** and
**JOHN J. GALLAGHER,**

having knowingly devised and intended to devise the aforementioned scheme and artifice to defraud and to obtain money by means of material false and fraudulent pretenses, representations, and promises, for the purpose of executing and attempting to execute said scheme and artifice, knowingly placed and caused to be placed in a post office and authorized depository for mail matter the following matters and things to be sent and delivered by the Postal Service, and knowingly deposited and caused to be deposited such matters and things to be sent and delivered by private and commercial interstate carrier, and knowingly delivered and caused to be delivered by mail and such carriers according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, such matters and things:

| Count | Defendant(s) | Approximate Date | Description |
|-------|--------------|------------------|-------------|
| 7 | **OLSON GALLAGHER** | June 16, 2020 | Shipping of the signed updated escrow letter from New Jersey to **GALLAGHER** at Theia's headquarters in Washington, D.C. by Attorney 1 |

**(Mail Fraud, Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Sections 1341 and 2)**

**Background on Tax Charges**

94.    The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for administering the tax laws of the United States and collecting taxes owed to the United States.

95.    An IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040"), is used by U.S. taxpayers to file an annual income tax return, which is typically due on April 15 of the calendar year following the tax year. Taxpayers are required to pay any taxes owed on or before the due date of the return, regardless of whether they file a return on that date.

96.     As detailed below, **OLSON** engaged in a multi-year scheme to evade at least $573,912.75 in assessed federal taxes (including credits) and $626,533.78 in assessed penalties and interest he owed for tax years 2009 through 2011.  He also failed to file income tax returns, failed to report $6,724,309.85 in taxable income, and evaded $2,383,099 in tax due and owing for the years 2018 through 2020, as follows:

| TAX YEAR | UNREPORTED TAXABLE INCOME | TAX DUE AND OWING |
|---|---|---|
| 2018 | $2,355,633.56 | $837,274 |
| 2019 | $1,184,092.50 | $403,102 |
| 2020 | $3,184,583.79 | $1,142,723 |
| TOTAL | $6,724,309.85 | $2,383,099 |

## COUNT EIGHT
### (Evasion of Payment—Tax Years 2009-2011)

97.     Paragraphs 1 through 84 and 94 through 96 are incorporated here by reference.

### The Examination of OLSON's 2009 through 2011 Tax Returns

98.     **OLSON** filed a federal income tax return for tax year 2009 on November 1, 2010. **OLSON** did not make any tax payments for the 2009 tax year, including estimated tax payments prior to filing or any payments with or after filing.

99.     On May 15, 2012, **OLSON** applied to participate in the IRS's Offshore Voluntary Disclosure Program ("OVDP"), related to offshore bank accounts that he failed to disclose to the Department of Treasury in previous years as required. Applicants to OVDP were required to, among other things, file any delinquent tax returns for the previous eight years.

100.     **OLSON** filed a delinquent federal income tax return for tax year 2010 on June 21, 2012, pursuant to the requirements of the OVDP. **OLSON** reported a tax liability of zero on that return.

101.    As part of the OVDP process, **OLSON** filed a delinquent federal income tax return for tax year 2011 on September 4, 2013. **OLSON** reported a tax liability of $2,995 on that return, which was offset by a claimed child tax credit.

102.    In January 2014, as part of the OVDP process, the IRS began an examination of **OLSON**'s 2009 through 2011 federal income tax returns.

103.    In August 2014, **OLSON** was rejected from the OVDP due to lack of compliance with the OVDP's requirements. The IRS continued its examination of **OLSON**'s 2009 through 2011 tax returns. As a result of the examination, in 2016, the IRS assessed **OLSON** the following tax liabilities, penalties and interest on those years:

| TAX YEAR | TAXES DUE (INCLUDES CREDITS) | ASSESSED INTEREST | ASSESSED PENALTY | TOTAL |
|---|---|---|---|---|
| **2009** | $419,534.00 | $223,975.60 | $208,411.35 | $851,920.95 |
| **2010** | $126,723.75 | $70,272.41 | $92,167.20 | $289,163.36 |
| **2011** | $27,655.00 | $12,947.72 | $18,759.50 | $59,362.22 |
| **TOTAL** | $573,912.75 | $307,195.73 | $319,338.05 | **$1,200,446.53** |

104.    In 2018, **OLSON** acknowledged his tax debt of approximately $1.2 million. However, notwithstanding this knowledge and despite earning millions during his tenure at Theia, **OLSON** did not remit and has not remitted payment for tax years 2009, 2010, or 2011. As of March 3, 2025, accruing interest has increased the amount **OLSON** owes for tax years 2009 to 2011 to $1,606,029.

**Use of MVC to Conceal OLSON's Assets and Income from the IRS**

105.    In December 2015, MVC was created as a holding company for **OLSON**'s, and later **GALLAGHER**'s, ownership interests in Theia. When MVC was initially formed, **OLSON** was MVC's president, chairman of the board, and sole shareholder. However, **OLSON** and **GALLAGHER** renegotiated their MVC ownership and roles multiple times.

106.    **OLSON** and **GALLAGHER** controlled MVC, and Individual 1 handled many of its administrative operations. Starting in December 2017 and continuing through December 2020, **OLSON**, with the assistance of **GALLAGHER** and Individual 1, used MVC as a vehicle to receive **OLSON's** compensation from his work for Theia, thereby concealing from the IRS millions of dollars of assets and income that **OLSON** received from Theia.    **OLSON** and **GALLAGHER** never filed a corporate income tax return for MVC.

107.    From in or about January 2018 through December 2020, **OLSON** received more than $6 million in cash from Theia paid through MVC's bank account including:

        a) $1,210,000 for two condominiums in Las Vegas for personal use;

        b) $292,080 for a private jet membership that **OLSON** put to personal use;

        c) $713,752.50 to satisfy **OLSON**'s child support debt, paid through a bank account of **GALLAGHER**'s law firm;

        d) $89,626.50 to satisfy the penalty **OLSON** incurred for failing to file a Report of Foreign Bank and Financial Accounts ("FBAR");

        e) $193,500 in rent payments for **OLSON**'s residence in New Mexico, leased in the name of MVC;

        f) $130,684.81 for a new Land Rover for **OLSON** that was not a company car; and

g) multiple other items worth tens of thousands of dollars for **OLSON**'s personal use.

108.    None of the income that **OLSON** received from 2018 through 2020 was reported to the IRS as required by law.

109.    OLSON also made false and misleading statements to an Assistant United States Attorney that he lacked financial means to pay the IRS his FBAR penalty and that money he had used to pay another debt was obtained by a loan.

110.    Beginning at least as early as January 2018 through the date of this indictment, in the District of Columbia and elsewhere, defendant

**ERLEND OLSON,**

a resident of Albuquerque, New Mexico, willfully attempted to evade and defeat the payment of income tax due and owing by him to the United States of America, for the calendar years 2009, 2010, and 2011, by committing the following affirmative acts of evasion, among others:

a) Causing compensation from Theia to be paid to a bank account held in the name of MVC;

b) Paying and causing to be paid personal expenses out of the MVC bank account;

c) Leasing his New Mexico residence in the name of MVC;

d) Purchasing assets through and in the names of nominees;

e) Directing that his pay and bonuses not be reported to the IRS; and

f) Structuring transactions to avoid reporting to the IRS.

**(Evasion of Payment, in violation of Title 26, United States Code, Section 7201)**

## COUNT NINE
### (Tax Evasion —2018)

111.    The allegations in paragraphs 1 through 84, 94 through 96, and 105 through 109 are incorporated here by reference.

112.    During the calendar year 2018, defendant

**ERLEND OLSON,**

a resident of Albuquerque, New Mexico, received taxable income, upon which there was income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before April 15, 2019, as required by law, to any proper officer of the Internal Revenue Service, and to pay the income tax to the Internal Revenue Service, **OLSON,** from January 2018 through the date of the indictment, in the District of Columbia and elsewhere, willfully attempted to evade and defeat substantial income tax due and owing by him to the United States of America, for the calendar year 2018, by committing the following affirmative acts, among others:

    a)  Causing compensation from Theia to be paid to a bank account held in the name of MVC;

    b)  Paying and causing to be paid personal expenses out of the MVC bank account;

    c)  Leasing his New Mexico residence in the name of MVC;

    d)  Purchasing assets through and in the names of nominees;

    e)  Directing that his pay and bonuses not be reported to the IRS; and

    f)  Structuring transactions to avoid reporting to the IRS.

**(Tax Evasion, in violation of Title 26, United States Code, Section 7201)**

**COUNT TEN**
**(Tax Evasion —2019)**

113.    The allegations in paragraphs 1 through 84, 94 through 96, and 105 through 109 are incorporated here by reference.

114.    During the calendar year 2019, defendant

**ERLEND OLSON,**

a resident of Albuquerque, New Mexico, received taxable income, upon which there was income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before July 15, 2020, as required by law, to any proper officer of the Internal Revenue Service, and to pay the income tax to the Internal Revenue Service, **OLSON,** from January 2019 through the date of the indictment, in the District of Columbia and elsewhere, willfully attempted to evade and defeat substantial income tax due and owing by him to the United States of America, for the calendar year 2019, by committing the following affirmative acts, among others:

a)   Causing compensation from Theia to be paid to a bank account held in the name of MVC;

b)   Paying and causing to be paid personal expenses out of the MVC bank account;

c)   Leasing his New Mexico residence in the name of MVC;

d)   Purchasing assets through and in the names of nominees;

e)   Directing that his pay and bonuses not be reported to the IRS; and

f)   Structuring transactions to avoid reporting to the IRS.

**(Tax Evasion, in violation of Title 26, United States Code, Section 7201)**

36

## COUNT ELEVEN
### (Tax Evasion —2020)

115.    The allegations in paragraphs 1 through 84, 94 through 96, and 105 through 109 are incorporated here by reference.

116.    During the calendar year 2020, defendant

**ERLEND OLSON,**

a resident of Albuquerque, New Mexico, received taxable income, upon which there was income tax due and owing to the United States of America. Knowing the foregoing facts and failing to make an income tax return on or before May 17, 2021, as required by law, to any proper officer of the Internal Revenue Service, and to pay the income tax to the Internal Revenue Service, **OLSON,** from January 2020 through the date of the indictment, in the District of Columbia and elsewhere, willfully attempted to evade and defeat substantial income tax due and owing by him to the United States of America, for the calendar year 2020, by committing the following affirmative acts, among others:

  a)  Causing compensation from Theia to be paid to a bank account held in the name of MVC;

  b)  Paying and causing to be paid personal expenses out of the MVC bank account;

  c)  Leasing his New Mexico residence in the name of MVC;

  d)  Purchasing assets through and in the names of nominees;

  e)  Directing that his pay and bonuses not to be reported to the IRS; and

  f)  Structuring transactions to avoid reporting to the IRS.

**(Tax Evasion, in violation of Title 26, United States Code, Section 7201)**

## FORFEITURE ALLEGATION

117.    Upon conviction of any of the offenses alleged in Counts One through Seven, the defendant convicted of such offense shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). The United States also will seek a forfeiture money judgment against the defendant in an amount equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

118.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

A TRUE BILL

_____
Grand Jury Foreperson

By

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY IN AND FOR
THE DISTRICT OF COLUMBIA

By

KAREN E. KELLY
ACTING DEPUTY ASSISTANT ATTORNEY GENERAL, TAX DIVISION
DEPARTMENT OF JUSTICE